UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

-----------------------------------------------------

| | |
|---|---|
| J.H., through his next of friend ROSIE PHILLIPS, | CASE NO. 18-cv-_____ |
| Plaintiff, | JUDGE _____ |
| v. | MAGISTRATE JUDGE _____ |
| SHERIFF STEPHEN W. PRATOR, as the public entity responsible for the Caddo Parish Sheriff's Office, | JURY TRIAL DEMANDED |
| Defendant. | |

-----------------------------------------------------

## COMPLAINT

BIZER & DEREUS, LLC
Attorneys for Plaintiff
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

## PRELIMINARY STATEMENT

1.      At the times relevant to this action, J.H. was an autistic, non-verbal minor. J.H. lives with his mother. In August 2017, J.H. began the 2017-2018 school year in the tenth grade and was placed at Northwood High School ("NHS"), which is a part of the Caddo Parish Public School system. J.H. was placed at NHS to receive special educational services in the school's program for children with severe and profound autism; specifically, he attended classes in a small, self-contained environment with other students with severe and profound disabilities.  J.H. has been in a self-contained educational setting for the majority of his education.  J.H. has no history of disciplinary issues at school and, upon information and belief, has never been physically restrained, secluded, or corporally punished at school.

2.      For the 2017-2018 school year, the Caddo Parish School Board entered into a Contract for Services with Stephen W. Prator, Sheriff of Caddo Parish, which permits, endorses, and authorizes armed Sheriff's deputies to perform security and law enforcement activities on a continuous basis at six school campuses within the city limits of Shreveport, Louisiana. One of these schools is NHS.  On information and belief, the assigned Sheriff's Deputy to NHS was Deputy Nunnery.  On information and belief, each school year, the Caddo Parish School Board and the Sheriff enter into such a contract for the provision of security and law enforcement services.

3.      At the time the Sheriff's deputies were deployed to patrol specific Caddo Parish public schools, the Caddo Parish Sheriff's Office knew or should have anticipated that its deputies would interact with children with autism and other severe and profound disabilities attending school. Upon information and belief, prior to August 2017, the Sheriff's deputies that were patrolling the hallways of NHS had little or no training on individuals with disabilities, interacting

with individuals with autism, or de-escalation protocols and related best practices for children with autism.

4.      On August 31, 2017, J.H. was in a special education classroom with his teacher and two other staff members. J.H. began to manifest symptoms of his disability and eventually ran from the classroom. In short, and as is fully described below, a deputy for the Caddo Parish Sheriff's Office was summoned to the hallway outside the classroom. The Sheriff's deputy proceeded to confront J.H. with his taser out at the ready. The Sheriff's deputy did not attempt to engage in de-escalation protocols or procedures. Instead, the Sheriff's deputy engaged the school staff to join him in forming a small semi-circle around J.H. for a period of approximately seven minutes. Unable to understand or comprehend the meaning of their actions, J.H. attempted to break free from the semi-circle. As J.H. began to move down the hallway, the Sheriff's deputy fired his taser, striking J.H., possibly several times, and sending him to the ground. J.H. hit the floor and laid there immobilized and in shock, urinating on himself. J.H. was left on the floor until his mother arrived.  In this period in which he lay on the floor, the Sheriff's deputy did not check his condition, his vitals, did not determine whether J.H. was still breathing, and made no motion to otherwise determine that J.H. was safe.

5.      Through the Sheriff's deputy's actions, Stephen W. Prator, Sheriff of Caddo Parish, violated the requirements of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973. Specifically, the Caddo Parish Sheriff's Office failed to make reasonable accommodations that were necessary for J.H. to meaningfully interact with the Sheriff's deputy.

6.      Following the incident, J.H.'s family noticed major changes in J.H.'s behavior. As a non-verbal child with autism, J.H. and his family have worked diligently to help J.H. overcome

and minimize manifestations of his disability and to gain some basic independent living skills and rudimentary communication with the outside world. The trauma and severe shock from being the tasing caused J.H. to significantly regress in these critical skills, and lose years of progress. Immediately after the incident, J.H. would not sleep in his own bed. J.H. is afraid to be alone, to leave his home, and to go anywhere without his family. After years of not engaging in common manifestations of autism like stimming behaviors and repetitive touching, J.H. suffered a significant relapse and began engaging in these behaviors in high frequency.  He has not wanted his family to leave the house or even the room without him. Also, he now prefers to be physically close to people and even holds on to them, where before he avoided physical proximity and contact. As a result of the incident, J.H. suffered serious emotional distress, trauma, anxiety, fear, depression, and invasion of his civil rights.

7.     ROSIE PHILLIPS sues on behalf of J.H. as his next of friend and seeks compensatory and nominal damages and attorneys' fees and costs to redress Defendant's unlawful discrimination. With regards to J.H.'s request for nominal damages, it is J.H.'s position that an award of nominal damages would confer significant civil rights to the public, as a judgment in his favor against Defendant, regardless of the amount, would deter Defendant from discriminating against individuals with autism in the future.

## THE PARTIES

8.     J.H. is an individual residing in Shreveport, Louisiana. J.H. has severe and profound autism and, as a result of his disability, is non-verbal. J.H. engages in various other behaviors commonly associated with autism. For example, J.H. engages in stimming (repetitive motions and/or touching intended to self-soothe), running, closing his eyes to self-soothe, rocking back and forth, and putting his fingers in his ears when he becomes overly stimulated. As an individual with

autism, J.H.'s manifestation of these repetitive behaviors is particularly pronounced in unfamiliar or frustrating situations, or in scenarios in which he is stressed, anxious, or afraid. Predictable, steady, and uninterrupted daily routines and stable environments are extremely important to J.H. When his environment changes or his routine is disrupted, it triggers manifestations of J.H.'s disability as well as behaviors associated with his autism that J.H. uses to self-soothe.  As an individual with autism, J.H. is substantially limited in several major life activities including hearing, speaking, thinking, and brain function. In fact, under Title II of the ADA, autism is an impairment that leads to a predicable assessment of a disability. *See* 28 C.F.R. § 35.108(d)(2)(iii). As such, J.H. is a qualified person with a disability within the meaning of the ADA.

9.     ROSIE PHILLIPS is the mother of J.H. and brings suit on J.H.'s behalf as his next friend.

10.     Defendant SHERIFF STEPHEN W. PRATOR, as the public entity responsible for the Caddo Parish Sheriff's Office (hereinafter "Caddo Parish Sheriff's Office"), is a public entity organized in the State of Louisiana and providing services in Caddo Parish, Louisiana

11.     Upon information and belief, the Caddo Parish Sheriff's Office primary address is 501 Texas Street Room 101, Shreveport, LA 71101.

12.     Upon information and belief, the Caddo Parish Sheriff's Office provides various services in Caddo Parish public schools, including in-school security and law enforcement services at NHS.

13.     As the operator, administrator, and provider of the in-school security services at NHS, SHERIFF is obligated to ensure that the manner in which it provides these security services complies with the requirements of the ADA and does not discriminate against persons with disabilities, including individuals who have autism and limited communication abilities.

## JURISDICTION & VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 for J.H.'s claims arising under federal law.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because SHERIFF resides within the jurisdiction of this District and a substantial part of the events that give rise to the claims occurred in this District.

## STATEMENT OF FACTS

A.     *The Caddo Parish Sheriff's Office Chose to Provide In-School Security at NHS Despite their Lack of Training on Accommodating Individuals with Autism or Attendant Policies.*

16.     On June 13, 2018, undersigned counsel Garret S. DeReus made a public records request seeking a copy of all training materials from August 31, 2013 through August 31, 2017 pertaining to Sheriff's deputies and individuals with autism and/or accommodating individuals with autism.

17.     In the public records request, undersigned counsel asked for the following information:

"1.     A copy of all training materials from August 31, 2013 to August 31, 2017 pertaining to interactions between Sheriff's deputies and individuals with autism and/or accommodating individuals with autism. You may exclude any records that only pertain to the Caddo Correctional Center.

2.     All written policy documents in effect from August 31, 2013 to August 31, 2017 pertaining to interactions between Sheriff's deputies and individuals with autism and/or accommodating individuals with autism. You may exclude any records that only pertain to the Caddo Correctional Center.

3.     A copy of all grievances from August 31, 2013 to August 31, 2017 by individuals with autism pertaining to an interaction between a Sheriff deputy and an individual with autism. You may exclude any records that only pertain to the Caddo Correctional Center. We also have no objection to you redacting any personally identifiable information.

4.     All written policy documents from August 31, 2013 to August 31, 2017 pertaining to interactions between Sheriff's deputies and individuals with communication limitations. You may exclude any records that only pertain to the Caddo Correctional Center.

***

6.     From August 31, 2013 to August 31, 2017, all incidents where a Sheriff's deputy assigned a SRO to a Caddo Parish public school deployed a chemical restraint on an individual, including but not limited to pepper spray, or engaged in the use of force. We also have no objection to you redacting any personally identifiable information."

18.     On July 20, 2018, the Caddo Parish Sheriff's Office responded by stating "The Caddo Parish Sheriff's Office does not have the means or keep statistics on the requested numbers: 1, 2, 3, 4 & 6."

19.     The Caddo Parish Sheriff's Office never produced any training materials from August 31, 2013 to August 31, 2017 pertaining to interactions between Sheriff's deputies and individuals with autism, as requested in item number one.

20.     The Caddo Parish Sheriff's Office never produced any written policy documents in effect from August 31, 2013 to August 31, 2017 pertaining to interactions between Sheriff's deputies and individuals with autism and/or accommodating individuals with autism.

21.     Upon information and belief, from August 31, 2013 to August 31, 2017 the Caddo Parish Sheriff's Office did not any written policy documents pertaining to interactions between Sheriff's deputies and individuals with autism and/or accommodating individuals with autism

22.     Upon information and belief, from August 31, 2013 to August 31, 2017 the Caddo Parish Sheriff's Office did not have any written documents pertaining to how Sheriff's deputies should interact individuals with autism.

23.     Upon information and belief, the Caddo Parish Sheriff's Office chose to provide

in-school security at NHS despite their lack of training on accommodating individuals with autism.

24.     Upon information and belief, the Caddo Parish Sheriff's Office does not have policy documents on accommodating individuals with autism.

25.     Upon information and belief, the Caddo Parish Sheriff's Office chose to provide in-school security at NHS despite the absence of policy documents on accommodating individuals with autism.

B.      *Individuals with Autism Engage in Predictable Behaviors—J.H. is No Exception and Engages in Predictable Behaviors when Confronted with Unfamiliar or Frustrating Circumstances.*

26.      Individuals with autism are often substantially limited in the life activities of learning, thinking, and brain function. These limitations lead to predictable and commonly identifiable behaviors.

27.     On information and belief, Caddo Parish School Board provided a training on interacting with individuals with autism on October 13, 2017, to Caddo Parish Sheriff's Deputies assigned to its schools as School Resource Officers. In attendance at this training was Deputy Nunnery – the same deputy that deployed his taser at J.H., as is described in-depth below. Unfortunately, the training was "too late" for J.H. because it occurred a full month and a half <u>after</u> J.H. was injured by Deputy Nunnery.

28.     The October 13, 2017 training was provided by Phyllis Rash and Jennifer Boyter, autism specialists and board-certified behavior analysts employed within the Caddo Parish Schools' Department of Exceptional Children. The training was entitled "Autism Spectrum Disorder Training for Law Enforcement Officers."

29.     In discussing difficulties in social interactions for individuals with Autism Spectrum Disorder, the presentation explained that individuals with autism can:

- Have difficulty with the give and take of everyday life; communication, play, emotions.

- Displays of anger and affection in atypical ways.

- May not respond to their name being called.

- Reduced interest in people or interested but have poor / awkward social skills.

- Difficulty playing social games; losing, taking turns, follow the rules of the game.

- Have difficulty interpreting what others are thinking or feeling.

- May miss social cues.

- May lack the understanding that others have different thoughts, feelings, and goals from them.

- May be 5-7 years more immature than their same age friends.

- The tendency to lose control: may be particularly pronounced in unfamiliar, or frustrating situations.

- Frustration can also result in self-injurious behaviors such as head banging, hair pulling, or self biting.

30.     In discussing communication difficulties for individuals with autism, the presentation explained that individuals with autism may experience the following communication barriers:

- Difficulties with verbal and non-verbal communication.

- 25% of individuals who have ASD are nonverbal.

- May have slight delays in language or may have precocious language and unusually large vocabularies.

- May get fixated on a topic. May carry monologues of a favorite subject giving others little chance to comment. May speak like a little professor.

- Can't join a conversation due to timing and topic maintenance.

- Prosody variance. Tone of voice may not reflect their feelings.

- Speaks in facts not socially appropriate material.

- Inability to understand body language and facial expressions.

- Inability to understand sarcasm and expressions like 'it's raining cats and dogs'. Many of our students take that literally.

- Facial expressions, gestures, and movements may not match what they are saying.

31.    In discussing repetitive behaviors by individuals with autism, the presentation explained that individuals with autism may exhibit the following behaviors:

- Common repetitive behaviors; hand flapping, rocking, jumping, twirling, arranging and rearranging objects, repeating sounds words or phrases.

- Repetitive behaviors can be self-stimulating like tensing and release muscles or wiggling their fingers in front of their eyes.

- Restricted range of activities; child may line cars up or spin the wheels instead of using them for pretend play, adults may have a fixed order for household items,

32.    The presentation also provided a number of best practices for interacting with persons with autism, some of which include:

- Only one person give directions in a quiet calm voice

- Do not raise your voice

- Be clear and concise don't change the directions

- Distract, Redirect, Reinforce

- Display calming body language; give him/her extra person space

- Use Simply language

- Speak slowing, repeat, and rephrase questions

- Allow extra time for response

- Seek advice from others on the scene who know the person with autism

33.     Like other individuals with autism, J.H. engages in predictable behaviors that are manifestations of his disability. For example, J.H. engages in repetitive touching and running. When in a familiar environment or engaged in a normal routine, J.H. typically only engages in minimal repetitive behaviors. In contrast, when exposed to an unfamiliar or stressful environment, J.H. is more likely to engage in repetitive behaviors. J.H.'s repetitive behaviors include closing his eyes, rocking, and putting his fingers in his ears. J.H.'s manifestation of these repetitive behaviors is particularly pronounced in unfamiliar or frustrating situations.

34.     While J.H.'s behaviors may seem "a-typical" when compared to a non-disabled individual, J.H.'s behaviors are entirely consistent for an individual with autism and represent a typical manifestation of his disability.

35.     Identifying the predictable behaviors of an individual with autism is not a difficult or complex task for an individual with the knowledge and training on recognizing common behaviors associated with autism. This is why training such as the "Autism Spectrum Disorder Training for Law Enforcement Officers" exists.

36.     Just as a deputy can be trained to understand that a person in a wheelchair cannot comply with a request to stand, a deputy can be trained to understand that a person with autism may not be able to understand complex verbal commands and/or may be nonverbal. Further, a deputy could be easily trained that when interacting with an individual with autism, alternative

best practices must be utilized.

37.     Autism training and certification are a common industry practice. For example, the International Board of Credentialing and Continuing Education Standards (IBCCES) offers training to law enforcement personnel on autism spectrum disorder and on how to recognize and communicate with an individual who may be on the autism spectrum.

38.     Upon information and belief, prior to August 31, 2017, SHERIFF did not provide any such training to his deputies – including deputies assigned to schools where they regularly interacted with students with autism.

   C.     *On August 31, 2017, Deputy Nunnery was Summoned to Interact with J.H. and he Had More than Sufficient Time to Engage in De-escalation Procedures or Otherwise Accommodate J.H.'s Disability.*

39.      In August 2017, J.H. began the 2017-2018 school year in the tenth grade at NHS, when his self-contained autism classroom was assigned there by the school board. J.H. had not previously attended NHS and the environment was unfamiliar and foreign to him.  The new environment and necessity of acquiring a new routine, including a new route to a new school each day, was extremely stressful for J.H. as a person with autism.

40.     Upon information and belief, J.H. has no history of discipline at school.

41.     Upon information and belief, J.H.'s mother has never received notice that J.H. was ever physically restrained, secluded, or corporally punished at school.

42.     The incident that is at issue in this case took place on August 31, 2017, J.H.'s fourteenth day in his new environment at Northwood. There is security footage of the hallway outside of J.H.'s classroom that depicts the incidents that occurred in the hallway, but not the classroom.

43.     The incident began shortly after J.H. arrived at the school. It is believed that J.H. was rubbing his stomach against the wall and staff person in the classroom asked him to stop.

Sometime shortly thereafter, J.H. walked out of the classroom and into the hallway, directly outside the door of the classroom.

44.     While it is unclear why J.H. walked out of the classroom, it is evident that J.H. became agitated and triggered by an interaction he had with a staff person in his classroom.  J.H.'s assigned teacher was not in the classroom at this time; there was another educator in the room supervising the students.  On information and belief, this educator is named Mr. Moore.

45.     Based on video footage, J.H. walked out of the classroom at approximately 9:24:40 a.m. At that time, J.H. walked over to the water fountain and began to compulsively drink water.

46.     Between 9:24:40 and 9:28:10, J.H. was compulsively drinking water, standing in the hallway, and placing his fingers in his ears – all of which are predictable behaviors of J.H.'s autism and are methods by which J.H. self-soothes when stressed.

47.     Between 9:28:10 and 9:32:15, J.H. walked in and out of the special needs classroom and continued to engage in manifestations of his autism.

48.     At approximately 9:32:15, two school administrators arrived in the hallway outside of J.H.'s classroom and approached J.H. Between 9:32:15 and 9:35:00 J.H. continued to attempt to re-enter his classroom. At approximately 9:35:00, a minor struggle occurred between the J.H. and the two administrators, who forcibly blocked J.H. from entering his classroom.

49.     Between 9:35:50 and 9:36:15, another minor struggle occurs between J.H. and the two administrators. At approximately 9:36:07, Deputy Nunnery arrived in the hallway outside the classroom. As he enters the scope of the security footage, his hand is shown already placed on his Taser. After swatting at the administrators, J.H. falls to the floor.

50.     At this time, Deputy Nunnery was the only law enforcement official at the scene. Therefore, he was in charge of law enforcement decisions at the scene.

51.     Shortly after Deputy Nunnery arrived at the scene, J.H. was exhibiting predictable and obvious manifestation of autism. J.H. had his fingers in his ears, and was leaning against the hallway wall with his head down, in an apparent attempt to self-soothe.

52.     For the next approximately five minutes and thirty seconds J.H. continued to exhibit predictable manifestations of autism and remained essentially motionless and planted in one location.

53.     During this time that J.H. stood motionless, J.H. was flanked by four large men. Specifically, J.H. was flanked by three school administrators and/or teachers and by Deputy Nunnery.

54.     As the law enforcement officer, Deputy Nunnery could have ordered the administrators and/or teachers to leave the scene while he obtained control of the situation. Upon information and belief, Deputy Nunnery gave no such instruction. Instead, all four individuals stood in a semi-circle around J.H.

55.     Upon information and belief, during the approximate five minutes and thirty seconds that J.H. was standing against the wall, Deputy Nunnery did not take any steps to de-escalate the situation. Instead, the manner Deputy Nunnery configured himself and the three administers in a semi-circle around J.H. conveyed a threatening and confrontational attitude to J.H.

56.     Upon information and belief, Deputy Nunnery did not use simple language or a quiet calm voice. Instead, with his Taser at the ready, Deputy Nunnery repeatedly instructed J.H. to "calm down" and said that he was "not going to let [J.H.]hurt him."

57.     Unable to understand what was occurring, J.H. attempted to get back into the classroom, which was the place he knew he was supposed to be. Between approximately 9:41:58 and 9:43:30, J.H. made various attempts to get back into the classroom.

-14-

58.     At approximately 9:43:30, J.H. began to move down the hall with his arms up at his sides and with his palms open. After being turned back, J.H. ran back towards an administrator and while running he kicked his leg in the direction of the administrator. Almost immediately thereafter, Deputy Nunnery deploys his Taser, striking J.H. At that point, J.H. falls face down to the floor where he remained dazed and motionless.

59.     J.H. was left in a pool of his own urine for approximately thirteen minutes before assistance was provided by emergency responders. Deputy Nunnery was present during this time but made no efforts to check J.H.'s condition.

60.     Eventually J.H.'s mother arrived at the scene and helped him up. After helping J.H. up, J.H. and his mother left the building, escorted by security.

61.     The SHERIFF never issued J.H. a summons or otherwise issued criminal charges against him as a result of the incident.

62.     Upon information and belief, Deputy Nunnery failed to reasonably accommodate J.H. because he was the only person giving directions and he did not do so in a quiet, calm voice.

63.     Upon information and belief, Deputy Nunnery failed to reasonably accommodate J.H. because he raised his voice.

64.     Upon information and belief, Deputy Nunnery failed to reasonably accommodate J.H. because he was not clear and concise, and he changed his directions.

65.     Upon information and belief, Deputy Nunnery failed to reasonably accommodate J.H. because he did not engage in the approach of "Distract, Redirect, Reinforce."

66.     Upon information and belief, Deputy Nunnery failed to reasonably accommodate J.H. because he failed to display calming body language and give J.H. sufficient personal space.

67.     Upon information and belief, Deputy Nunnery failed to reasonably accommodate

J.H. because he failed to use simple language.

68.     Upon information and belief, Deputy Nunnery failed to reasonably accommodate J.H. because he failed to speak slowly and repeat and/or rephrase questions.

69.     Upon information and belief, Deputy Nunnery failed to reasonably accommodate J.H. because he failed to seek advice from others on the scene who knew J.H.

      D.     *J.H. Experienced Serious Damages as a Result of the SHERIFF's Complete Failure to Accommodate his Disability.*

70.     The SHERIFF knew or should have known of its obligations under the ADA to accommodate individuals with disabilities, including individuals who have autism, and to develop policies to promote compliance with these statutes.

71.     The SHERIFF, through Deputy Nunnery, knew or should have known that his actions and/or inactions created an unreasonable risk of causing J.H. to experience greater levels of fear, anxiety, indignity, humiliation, and emotional distress than a non-disabled person would be expected to experience.

72.     The harm sustained by J.H. herein is the expected and foreseeable consequence of the SHERIFF's failure to comply with the requirements and mandates of federal civil rights laws. These statutes and accompanying regulations exist to ensure that individuals with disabilities will have full use of all services, programs, and activities provided or made available by public entities. When the SHERIFF failed to adhere to its obligations under these statutes and regulations, it was imminently foreseeable that J.H. would sustain the exact harms alleged in this lawsuit.

73.     Despite the SHERIFF's knowledge of its obligation to accommodate persons with disabilities and avoid discrimination – including individuals that have autism – the SHERIFF did not take adequate steps to ensure that it accommodated J.H. Nor did the SHERIFF take adequate steps to avoid discrimination on the basis of disability.

74.     The SHERIFF discriminated against J.H. with deliberate indifference to his rights under the ADA.

75.     Based on the facts alleged above, the SHERIFF intentionally discriminated against J.H.

76.     Further, Deputy Nunnery was purposeful in his choices, which is sufficient to constitute intentional discrimination under the ADA.

77.     In the alternative, the SHERIFF is liable under the ADA pursuant to the case of *Kelly v. Boeing Petroleum Servs., Inc.*, in which the Fifth Circuit held that the Supreme Court case of *Alexander* expressly rejected the notion that a plaintiff is required to show intentional discrimination to establish a prima facie case of disparate impact discrimination. 61 F.3d 350, 365 (5th Cir. 1995). Upon information and belief, the SHERIFF's failure to promulgate policies and/or practices to accommodate individuals with autism has a predictable disparate impact on persons with disabilities, including J.H.

## CLAIM FOR RELIEF I: VIOLATIONS OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT

78.     J.H. repeats and realleges all preceding paragraphs in support of this claim.

79.     At all times relevant to this action, Title II of the ADA, 42 U.S.C. § 12131, *et seq.* has been in full force and effect and has applied to the SHERIFF's conduct.

80.     At all times relevant to this action, the U.S. Department of Justice regulations implementing Title II of the ADA, 28 C.F.R. Part 35, have been in full force and effect and have applied to the SHERIFF's conduct.

81.     At all times relevant to this action, J.H. has been substantially limited in several major life activities, and as such is an individual with a disability within the meaning of the ADA, 42 U.S.C. § 12102(2).

82.     The SHERIFF is a public entity within the meaning of Title II of the ADA, 42 U.S.C. § 12131(1).

83.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

84.     Federal regulations implementing Title II of the ADA provide that a public entity may not "(i) deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; [or] (iii) provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1).

85.     Federal regulations implementing Title II of the ADA further provide that "a public entity shall operate each service, program, or activity so that the service, program or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a).

86.     Federal regulations implementing Title II of the ADA further provide that a public entity may not "Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." 28 C.F.R. § 35.130(b)(1)(vii).

87.     By and through their actions set forth above, the SHERIFF discriminated against J.H., on the basis of disability, in violation of Title II of the ADA and its implementing regulations.

88.     J.H. is therefore entitled to declaratory relief, compensatory and nominal damages, and attorneys' fees, costs, and expert expenses.

## CLAIM 2: VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT

89.     PLAINTIFF repeats and realleges all preceding paragraphs in support of this claim.

90.     At all times relevant to this action, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, has been in full force and effect and has applied to DEFENDANT'S conduct.

91.     At all times relevant to this action, the United States Department of Health and Human Services ("HHS") regulations implementing Section 504 of the Rehabilitation Act, 45 C.F.R. Part 84, have been in full force and effect and have applied to DEFENDANT'S conduct.

92.     At all times relevant to this action, PLAINTIFF had substantial limitations in several major life activities including hearing, speaking, thinking, and brain function and was an individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(9).

93.     At all times relevant to this action, DEFENDANT has been offering programs, services, activities, or accommodations receiving federal financial assistance pursuant to 29 U.S.C. § 794(b).

94.     Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

95.     The Rehabilitation Act extends relief to "any person aggrieved" by discrimination in violation thereof. 29 U.S.C. § 794a(a)(2).

96.     DEFENDANT has discriminated against PLAINTIFF, on the basis of disability, in violation of 29 U.S.C. § 794.

97.     PLAINTIFF is therefore entitled to seek and recover compensatory and nominal damages for the injuries and loss he sustained as a result of DEFENDANT'S discriminatory conduct as hereinbefore alleged, pursuant to 29 U.S.C. § 794(a).

98.     PLAINTIFF is further entitled to an award of attorneys' fees, and costs (including expert expenses) pursuant to the Rehabilitation Act, 29 U.S.C. § 794(a).

## PRAYER FOR RELIEF

**WHEREFORE,** J.H. respectfully prays that this Court grant the following relief against the SHERIFF:

A.    Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that the SHERIFF's policies, procedures, and practices subjected J.H. to unlawful discrimination in violation of the ADA and RA;

B.    Award to J.H.:

    i.    Compensatory and nominal damages pursuant to the ADA.

    ii.    Reasonable costs and attorneys' fees pursuant to the ADA.

    iii.    Interest on all amounts at the highest rates and from the earliest dates allowed by law.

    iv.    Any and all other relief that this Court finds necessary and appropriate.

## DEMAND FOR JURY TRIAL

J.H. demands trial by jury on all issues.

Dated: August 1, 2018

Respectfully Submitted,

**BIZER & DEREUS, LLC**
Attorneys for Plaintiff
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

By:/s/ Garret S. DeReus
        Garret S. DeReus